Case number 25-5122 et al. Climate United Fund et al versus Citibank, N.A., Environmental Protection Agency, and Liam Zeldin in his official capacity as Administrator, United States Environmental Protection Agency, et al. Mr. Roth for the EPA, Mr. Allen for Citibank, N.A., Mr. Nikoski for the private plaintiff's appellees, Ms. Riddipo for the state bank's appellees. Good morning, Mr. Roth. Good morning. You may proceed when you're ready. Thank you, Your Honor. May it please the Court, Jacob Roth on behalf of the Federal Defendant. Your Honors, our basic position here is that the plaintiff's only cognizable claims are found in contract, and that affects both where the claims can be pursued and the remedy the plaintiffs may seek. As the Court knows, the dispute really boils down to the question of whether these claims are in essence contractual. What I'd like to do to start is offer two hypotheticals that I think can help tease out why the answer is yes. The first hypothetical... I want to hear that, but I want to hear before, just before you get into that, because I know there's a lot to say about the Tucker Act. If the district court's injunction were to be lifted, what would happen to the disputed funds? Well, it's a good question, Your Honor. Actually, because the TRO was issued immediately after the termination of the grants, but before anything happened to the funds, we're sort of speculating a little bit about exactly how it would play out. I think what would happen is Treasury would terminate the financial agency agreement with Citibank, and that would cause the funds to revert to Treasury, and then the question becomes, can they be what we call re-obligated? It's really a replacement grant, is the way EPA is thinking about it, to replace the grant that had been terminated. And in terms of replacement grant, my understanding from briefing is that that's actually a very narrow... has very narrow parameters, and effectively would have to go back to the same organization. We agree it's narrow. We don't think it needs to be the same organizations. The details of that are... would need to be worked out, obviously, with OMB and subject to GAO guidance on that question. But we didn't get there. We didn't get anywhere close to there because immediately after the grants were terminated... But we have to think about Congress's intent here in setting up agency. And the replacement grant is an authority that gets around the appropriations limitations. I mean, I doubt it cannot be re-obligated. That's right. So the appropriation has expired, and the question is, if a grant that was obligated prior to the expiration can no longer be effectuated here because of termination, what can the agency do with that appropriation? And there is a limited set of circumstances in which they can be... Funds go back in the treasury, and the appropriations expire. How can you not have an appropriations clause problem? Well, the GAO guidance does provide for what they call replacement grants under limited circumstances, where it's not considered a new obligation. It's considered a replacement for the old obligation. Exactly where the line is on that is, you know, I think a fairly debated question. If they can't be re-obligated, and I think Judge Kapsitz is right, then the money would sit in an expired account for a while because of the expiration of the grant. But again, I think we're sort of jumping ahead a little bit because the initial question is, can EPA terminate the grant? That's actually all that has happened so far in this case is the termination of the grant. Can I just ask one more before you get into the hypos? What are we really fighting over? If you're going to re-obligate anyway, it's largely the same kind of grantees for the same kind of purpose. You all might think this is hugely wasteful spending on a very bad idea, but it's going to happen anyway. Are we just fighting over you want to redo the grants to have better transparency? Yes, it's the oversight point. I mean, that was the basis given for the termination. That was EPA's concern with the way these contracts were structured, and that's what the EPA would like to remedy for re-obligation. My understanding is that there is just as much, if not more, transparency over these funds because the EPA can see exactly what's going on in the city bank accounts, and they have all the reporting and all the checks on how they're spent that they would have in any grant situation, if not more. Your Honor, I think there's two aspects to it. One is the way these grants are structured, it's essentially a large advance, and then there's reporting later of like, you know, every year what did you do with the money as opposed to up front. More personally plus in real time visibility. Yes, the EPA has ability to see the money flowing out, right, of the accounts. Yes, they have that, but they don't have, other than in particular circumstances that are specified in the contract, they don't have a pre-approval sign off. Right, and that's by design. I mean, there's a whole... Well, certainly by design. ...by professors about, you know, the funding. This is a, it's a not traditional, you know, government programming, but really trying to leverage private investment. I understand these plaintiffs undertook to something like, you know, leverage the government's money, something like five to seven times private investment so that it costs the taxpayers a lot less to build these energy infrastructure projects. But my understanding about why this was designed this way to have the money, as you put it, parked, you know, outside of the government and not be the, you know, after the fact reimbursement was so that these entities would be in a position then to do that leveraging, would be in a position to be seen as a stable and adequately funded partner up front. And so if that model, I mean, if there's something illegal about that model, we should know, but I don't see anything to that effect. And I don't see after how many months, actually any evidence of the structural problems that the government purported to rely on here. So, Your Honor, I think that's conflating two different questions. One is who has, you know, from sort of an accounting standpoint, can the grantees claim these monies on their balance sheet for purposes of leveraging? And then there's a separate question of oversight on how they then spend the money and EPA's ability to monitor that and sign off on that and understand what's going on with the money flowing out. I think those are not necessarily tied together. You could have a regime where the money is held on their balance sheets, but nonetheless, EPA is entitled to additional rights in terms of being able to approve the expenditures to subgrantees and sub-subgrantees. And in fact, the contract does give EPA certain rights in that respect. They're just very limited. And most of the expenditures don't need to be pre-approved or pre-cleared. The other aspect of it that's problematic... The additional rights to approve, I mean, would that be... What's missing internally? What is the concern, given that these grantees are subject to very strict guardrails and if the money is misused, they're subject to criminal penalty? I think it's the ability to ensure that that's actually happening. That those guardrails are being respected and enforced. So it's the EPA's ability to see and understand what exactly the money is going to. And then what I was going to get to, the second sort of aspect of the problem from an oversight perspective, is you might have thought that with $20 billion, there would be a large number of grantees doing a large number of projects, right? Like you could have 1,000 projects for $20 million each. Instead, we have almost all of that money being granted to three organizations that then go through the process of sub-grants to others who then pass it through to others. And the further removed it is, the harder it is for EPA to be able to understand what's going on and to trace the money. And so that is part of the concern as well from an oversight. I didn't see that argument in your brief, but... Yeah, the pass-through, it is. I've done a lot of reading. There's been a lot of briefing, and very quickly, but... So this is a pass-through? The pass-through aspect of the way these are structured is unusual. So why not modify the grant agreements instead of canceling that? I mean, I thought EPA has already done significant audits and continues to do so. It's trying to. It's actually very hard, and that itself is costly. The administration costs of these grants are significant. But I think the point of termination is that's the leverage that EPA has under the contract. EPA doesn't, you know... The way to fix this, at least EPA's determination about the way to fix this was these are fundamentally structured in a way that impedes oversight. They were modified, of course, in a very questionable point in time to further impede oversight. And EPA's determination... They were in place already, as you know. But they were strengthened. They were significantly strengthened in the amendments that occurred after the election. And so EPA's determination was these need to be terminated, and we need to redo them. And again, the question for the court is just is the challenge to that action, to the termination of the grants, is that, in essence, a contractual claim? Mr. Roth, can I ask you... So I take the grantees... One of their primary arguments is that they have title to these funds because of the way, a somewhat unusual way, that this money is dispersed to them into their accounts at Citibank, and now that they have title to that. And so they're making a kind of property claim. And so I have actually read through a lot of the grant agreements, and I guess... So if there's a question about whether they have title to the funds, it certainly doesn't seem obvious to me, at least in reading the grant agreements. But if there is a serious question about that, is that question one that's appropriate for the district court or for the court of federal claims? Because the threshold question, you know, whether they have a property right. And if they do have a property right, presumably they could remain in district court. I'm interested in both of those questions, right? How do we figure out whether they have this property right? And who decides if they have a property right under the grants? Would it be appropriate for jurisdiction to remain in the district court, or would that question also go to the court of federal claims? So, Your Honor, the way I see it, they certainly have rights and interests in these funds, but so does EPA, and the contract itself makes that clear. I mean, this is a 60-page single-space grant agreement. All sorts of provisions about who can do what with the money when. And so I think the takeaway for me from that agreement is that the nature of the dispute is over the contractual provisions and EPA's ability to terminate under those contractual provisions, which to me is a contract question. So, assuming I agree with that as a general matter, this more specific question about whether they have title, whether they in fact have a claim, like, I guess my question is this. Assuming they did have title, these funds, that we were to read the contract and conclude it had title, then would jurisdiction be appropriate in the district court? No, I don't think so, because I think the debate would remain whether EPA is entitled under the contract to terminate, and even plaintiffs don't dispute, two things, that EPA has an interest, secured interest, in the funds under the agreement, and two, that there is a termination provision in the agreement. So that clause in particular, I find very hard to reconcile with their argument that essentially this is not a contract dispute. We just have the money. It's ours, and if you want to have a fight about that, it's a property fight, not a contract fight. There is a provision in the contract that allows for termination under certain circumstances, which to me is completely inconsistent with the idea that this is all done. The merits of whether they have property rights. So my assumption is, just assuming, and I know you disagree with this, that they do have title. If that was the case, would they have a property right claim they could bring in district court? I don't think so, Your Honor. Let me offer this hypothetical. So they analogize in their brief to a mortgage. They say it's essentially like we have the house, the bank has an interest because they've lent money for this. So do you have a mortgage agreement with a bank? And the agreement has a provision for when the bank can initiate foreclosure proceedings if you default, right? And let's say the bank initiates the foreclosure and I say, wait, I did pay. You're misreading the contract or you don't have the facts right. I would sue the bank for breach of contract because we have an agreement that dictates when the bank is able to do that. And I'd be saying, you are exceeding your rights under the contract. Now I could get specific performance probably against the bank in that scenario, but that's because the bank is not the federal government. And so I have a broader set of remedies available to me, but it's still fundamentally a contract dispute. So your position is that there's no way to recharacterize this contract claim as a property claim? On this contract, I don't think so. I think you do have to look at the contract in order to sort of appreciate that that's the world we're in, right? You look at the contract and you see, okay, this is a five-year arrangement where there are lots of things the EPA has to do over the course of that five years, sign off on things, approve a work plan, approve a budget. The grantees have to make certifications every time they disburse funds. You do have to look at that to appreciate we're in the middle of a course of performance that is going both ways and that is expected to go both ways for a number of years. That tells us this is a contract fight. And I did want to sort of start by offering these hypotheticals to try to tease that out. I'm going to let you do that, but I'm just on this very same issue that, Cedra, I was pressing you on, land versus dollar, same kind of debate. The Supreme Court there said that the plaintiffs weren't relegated to the court of claims, that they had, or at least claimed, and I said that's a merits issue that would have to be resolved, but they had claimed an ownership interest in the shares. And yes, that was a question of the nature of the agreement between them because they were using the shares, they said it's collateral, the Maritime Commission said, no, you turn them over to us. Right. Well, you know, I think to me the important aspect of land versus dollar that's different from here is the court emphasized there the party's obligations under the contract were over. The contract itself had sort of been completed, we had moved on, and now the question is who owns this sort of post-contract? That to me is a lot closer to the Megapulse set of facts where you may have originally come into acquisition of some sort of property by virtue of contract, but at the point of the dispute, that's not an issue. What's at issue is how are you then using that going forward? And the claim in Megapulse was that the use of the property was inconsistent, violated the statute, so fine, no problem, that's not a contract dispute. Here, again, we're only a few months into a contract that is scheduled to last three years and that has a termination provision in the contract. So the way I was trying to conceptualize this was... Go ahead, go ahead. Okay. So if we think about the same agreements that we had here, but imagine that the grantees were convicted of wire fraud in connection with the administration of those grants. And so under the terms of the contract, there would then be no dispute that termination is permissible. Would Plankist still have a claim? Would we still be here having this dispute under those facts? I think the answer is no. Then if we change the hypothetical a little bit, we say, okay, assume the same facts as this case, but let's imagine that the grant agreements had said termination, EPA may terminate this agreement at any time for any reason. Would we still be here having this dispute on those facts? I think the answer is no again. And if I'm right about that, I think the consequence is this case hinges on two things. What do the contracts say? And have those terms been satisfied? In other words, contract interpretation, contract application. If that's not, in essence, contractual, it's hard for me to see what would be. I mean, this is an area, as you know, we've been working with these CADRAC cases and other cases recently. And so let's say with the mortgage situation, homeowner has a mortgage. And instead of foreclosing, the bank representatives come with a moving truck and start taking away the Plankist property and inviting someone else to move in. It doesn't look anymore like a contract dispute. It looks like some kind of invasion of a property interest. And I thought actually that our court's treatment in TransOhio was very interesting because there's an underlying contractual right to the supervisory goodwill of the members of the board of the board of trustees.  this is the one with the failing thrift and the thrift and new legislation comes in. But the court says, well, these are constitutional ancestry claims. They go to the district court. The thrifts end up losing. But in terms of the jurisdictional threshold, I'm sure you could characterize that as really a contract claim because the question is, what is the nature of what they were given when they were afforded the authority to claim the supervisory goodwill as an asset? And in fact, in the end of the day, the court says that there wasn't the power to trump the will of a future Congress. But nonetheless, it's based on contract. Well, yeah. I mean, I think the way I understand TransOhio was the court was saying with respect to the claims that are based on the statutory, they claim to be their statutory or constitutional rights. We can go ahead and analyze that. And I'm happy to do that for this case as well. And I can get to that in a minute. But I do think the facts of this case and the arguments in this case are much more close to Ingersoll Rand, where it was a termination of a contract. The challenge was to the termination of the contract. And this court said, if you're challenging the termination of the contract, that's a contractual claim, even if it sort of also derivatively runs afoul of a regulation. I'm not really seeing a lot of difference between this case and Ingersoll Rand, but I'm happy to talk about the statutory and constitutional rights because that is what TransOhio said the court can review. And plaintiffs do emphasize those sort of ostensible rights here to try to get away from the Tucker Act problem. And I'm not really sure whether the right way to analyze it is to say those are still contract claims and therefore they have to go to the claims court or whether the better way to analyze it is to say those claims fail on the merits to the extent that they're being used to try to get the relief that plaintiffs are asking for here. Either way, I'm sure it doesn't justify the preliminary injunction, but we sort of have to go right by right through the analysis. Can I ask, your position in a nutshell, I think, is does the right to terminate turn on what's in the grant or what's in the regs? And I can imagine a lot of cases where the answer to that question would be pretty clear. But there's this weirdly endless loop quality to this where you look at the termination reg and it has some substantive rules, like you can authorize this termination based on no longer effectuating agency policy. It has a process rule, which is you have to put termination grounds in the grant. And then it has a cross-reference to the grant. You can terminate for failure to satisfy the grant, all of which is good for you. But then you go to the contract and it says right to terminate only as specified in the regs. And the grant points you to the regs and the regs point you to the grant, and it starts to look kind of messy to figure out what source of law is governing the scope of your right to terminate. Your Honor, the way I see it, the reg provides certain grounds, but the reg also says you can terminate consistent with the terms and conditions of the grant, which points us to the grant. And I think once we're then pointed to the grant, the important point is it's a contract fight about the terms of the grant. So if it violates the terms of the grant, it might also violate the reg. If it's consistent with the terms and conditions of the grant, then it's consistent with the reg, but it all therefore turns on what are the terms of the grant and have they been satisfied, which again to me is a sort of classic contract dispute. And look, we have, you know, I'm not going to get into necessarily here. I don't think it's appropriate forum to get into what our contract arguments are, but we do have arguments that the termination was consistent with the terms of the grant, which we will raise in, you know, once this is properly characterized as a contract claim and we can do factual development necessary for a contract claim, we can make that argument. But for present purposes, all that really matters is that it is at its nature a contract claim. But I do want to address the statutory quasi-constitutional argument that Judge Pillard asked about because plaintiffs do put a lot of emphasis on that. They really point to two statutes, the APA and then the appropriations law itself. I think the APA clearly doesn't work in getting them anywhere. I mean, Megapulse itself said every contract breach and termination could be recharacterized as arbitrary and capricious. That can't possibly be enough to get you out. Some can be. I mean, some cases that have some contract in them are nonetheless pursued and we know can be pursued under the APA. So, anyway. Well, I think you need some... Keep going. Right. Your Honor, I think you need some independent substantive right apart from the contract and apart from the APA that you'd be able to point to. And the only thing they point to here is the appropriations law itself, which simply says here is some money that is available for EPA to make grants. I think it's important to distinguish here the situation that this court has been grappling with in the radio-related cases where the appropriations statute itself identified the recipients. And so the court is struggling with how to characterize that. What we know is the source of rights. The statute is the source of rights. The grant agreement. Here, the statute doesn't identify any recipients. It just says here is money for grants. EPA made the grants. It made the grants by the deadline in the statute. And nothing in the statute says those grants cannot be terminated. And I don't think that would be a plausible reading of the appropriations statute either. Mr. Walker, are you saying that makes a difference? I thought the government's position in the radio cases was that having that type of statute doesn't make a material difference. But here you're arguing that it is. I'm just saying it's easier, Your Honor. I think this case is an easier case in the sense that there is no conceivable argument that the grantees have independent rights that are conferred on them by the appropriations statute. It's all coming from the grant agreements. Well, you have Congress saying, here's a program we're setting up and we're appropriating money. We want the particular activity that we've identified, this infrastructure, energy infrastructure, advanced energy technology to be developed. That's what we want. And we want it to happen quickly. So there's an appropriations, there's a deadline for actually doing the contracting and getting the money out the door. That's September, 2024. EPA complies and identifies these grantees. They qualify. EPA gets them. Everything's good. And why is it not a separation of powers claim when the plaintiffs say, okay, now EPA does not value this kind of energy development activity, terminates the grants to, in their view, permanently obstruct and foreclose implementation of this congressional program. I mean, we have cases, Bowen National Center for Manufacturing, Maryland Department of Human Resources, where there's a contract in there somewhere, but there's still the plaintiff's claim is not you violate her contract. It's you are upending unilaterally as the executive upending the will of the Congress that appropriated these monies for this purpose. So I think there's at least two reasons why that's not correct. But one is that's not what EPA is doing. So again, EPA has been really clear on this from in the termination letters and in every statement it's made that this is not some sort of frontal assault on the appropriation or Congress's objective. In fact, there's a whole series of grants, the solar grants, that were not touched because they don't implicate the structural problems with these particular grant agreements. So the problem that EPA has is with these contracts, not with the statute, and that's why EPA has made very clear it intends, as consistent with principles of appropriations law, to continue to make these funds available in a permissible way and in a way that comports with the oversight principles that it thinks are important here. So that's sort of number one. You said there were two things. One was that this is not done for disagreements with the objective, and the other is... So the other is, you know, I don't think this statute actually compels the entire amount to be spent, unlike some other appropriation statutes. So they cite a case where the law said, you know, agency shall do something. You know, sometimes it's agency must. It doesn't say that here. So this just says here's money. It's available to make grants. So I'm not sure they even get past that first step of there's a mandate from Congress to spend the entirety of the funds. Now, again, EPA is not planning to sort of set aside the money. EPA does really want to have these funds be available for the purposes Congress identified, but just from a legal standpoint, I think they have sort of two hurdles they have to get over that they can't. So you said that it's been really consistently clear that this is not an assault on Congress's objectives, but the district court held, in support of the preliminary injunction, something else, that actually EPA had terminated the grant, and just because it had decided to shut down the program because it disagreed with it as a policy matter. And in fact, I'm trying to remember, there was a communication from the EPA to the court saying, don't worry about irreparable harm to the reputation of the plaintiff. It's not gonna be reputationally damaging to them because it's just a policy disagreement. It is a policy. Not what they're doing. It is a policy issue, Your Honor, but it's a policy issue with these contracts, not with statute. So it's about the transparency and the fraud and the- It's a risk of fraud, yeah. To be clear, we're not accusing anybody of fraud. I don't wanna suggest otherwise. It's a risk issue, right? Does EPA have the tools and the oversight that it needs under this contract to ensure that that doesn't happen? And that was the concern that motivated the termination. Now, you're right, Your Honor, the district court did say, no, this is really an effort to dismantle the program. The court didn't cite anything for that proposition, and I don't think it's supportable based on anything in the record. Again, the materials from the EPA have been quite clear and consistent on both the reasons for the terminations as focused on the contract and on their intent going forward to ensure that the money is used as Congress intended. Can I just ask, why didn't EPA or the government here issue a notice of exclusive control? Yeah, so it sort of goes back to- There seems to be a mechanism that's available. So it sort of goes back to what I was saying at the very beginning with Judge Pillard, which is we never got to the point of actually taking the money back. The first step is terminating the grant. Once the grant is terminated, there's no live grant. Money can't be spent because there's no approved work plan anymore for spending the money. And then that was immediately- We immediately had a TRO that froze everything. And so since that point, we've been in just a period of frozenness where the money is still in the account. It can't be spent by anybody. It can't be pulled back by us. But, you know, so we never got there. So the notice of exclusive control would always come after a grant termination? That's how I read it. I'm not sure. Just to be clear, I'm not certain that it's actually required because I think the alternative, as I was saying, is if Treasury terminates the agency agreement with Citibank, which it can do at any time, then the money may revert to Treasury just by virtue of that. But, again, we never got there. So it's sort of- As you know, the facts here are not great for the government. When the district court scheduled a hearing on March 11th, and the government asked as a matter of courtesy for an extra 24 hours, it had just recently said, oh, we have some concerns. We've sent questionnaires to all the grantees. We expect the answers, I think it was by March 28th. without having any of those answers. And as far as I can tell from the record, zero substantiation that any fraudulent activity is occurring. Am I right? Zero substantiation. In that 24-hour grace period that the plaintiffs agreed to and that the court allowed, the government canceled these agreements. Yeah. Well, let me just say, Your Honor, I can assure the court that the line attorney who requested an extension on the brief was absolutely not trying to game anything with respect to EPA's actions on the grant. They were two completely separate processes that were playing out at the same time. And it is unfortunate that the timing went out that way. I don't think we're accusing- Okay, I just want to be clear. The line attorney of misconduct. Okay, good. I think there is a question about the timing of the EPA decision-maker. Well, I think, Your Honor, the way I understand the record is, yes, EPA sent out these questions, and I think EPA ultimately concluded the fact that they need to be sending out these questions and waiting for the grantees to answer these questions really confirms the problem with the way these grants are structured because they should not need to do that. They should have that information available to them. And the lawsuit was filed, and this was a fast-moving situation, and EPA made the determination to terminate the grant. Even now that it's clear to me, you argue that these terminations were reasonable because of the substantial concerns about program integrity and the award process and the unusual putting it in Citibank. But the plaintiffs and their amici describe how this structure actually affords EPA greater oversight over how these funds are being spent than the standard structure. So if you could just pinpoint for me, what is it that EPA doesn't have that it needs and why... It's really a two-part question and why some kind of renegotiation of these contracts while they are still in place was not absolutely adequate to address that. So the first thing I would say, Your Honor, is I think that's an arbitrary and capricious challenge to the termination of the grants, and our fundamental point is that's not cognizable because of the Tucker Act. So you cannot challenge a termination... Let me ask you a substantive question. We have the Tucker Act issue. Okay, I just want to make clear that that's... But I'm asking you about the conduct. When you get to the court of claims, what is your likelihood of success on any of these issues? Well, I think when we get to the court of claims, the questions will be, did we have the contractual right to terminate under these conditions? And then number two, if not, what are the damages that the plaintiffs are entitled to? So what is the lack of visibility that you have and why, if there's a problem with the structure but that hasn't played out in any activity that you could identify over what's now been, you know, a considerable period, why isn't tweaking the... approaching them, keeping the program up and running and negotiating something different absolutely the adequate response? So, Your Honor, it may be that this could have been modified and that the issues could have been addressed by modification rather than termination. I don't really know the answer to that, but I'm not sure it matters for purposes of either this court's review or the claims court's review because I think in the claims court, the question isn't going to be the reasonableness of the concerns. It's going to be how much leeway did EPA have under the contract to make these kinds of decisions? So assume for purposes of my question, you aren't in the court of... Assume for purposes of my question that we say, you know, no, this is not really our contract action. What is the lack of visibility? What is the problem? So it's really about the sub-awards and the sub-recipients. But you've frozen with respect to the immediate grantees, not just the sub-awards. No, I think it's both, Your Honor. I know, but you have enough visibility into the primary, into the close-in grantees? We see the... Yeah, the top of the pyramid is eight grantees. But eight grantees aren't themselves spending $20 billion on projects. They are passing... So what is the problem with the subs? The problem is that EPA doesn't have the ability to see what the subs are doing. And in turn, how the subs are passing the money through to further people down the chain. We don't have the visibility to see how they're making those decisions or how that money is being used. Or at least EPA's determination was that it does not have enough ability to oversee the money at those lower levels, which is how it's ultimately being spent. I know this is way in the weeds, but is there some mechanism that EPA has in mind that it would put in place when it... when it re-obligates these funds? I don't know the answer to that, Your Honor. I think there are probably different ways to do it, but I'm not in a position to specify how they would address that. I can just say that is the issue. That's what distinguishes these grants from, for example, the solar grants that they have not touched, which are a $7 billion program, but it doesn't present the same issues. So whether we agree with the EPA or not on this, it's a legitimate concern that the agency has about its ability to monitor and ensure that the funds are being properly dispersed and expended. Thank you, Your Honor. Thank you, and we'll give you time for rebuttal. Good morning, Mr. Wynn. Good morning. May it please the Court, Wynn Allen on behalf of Citibank. Pardon me? Happens every day. Mispronounced my name, but they don't have to use it. I know. It's just my last.  The hazards of having two first names. Allen. Two brief points, and then I'm happy to answer any questions that the panel has. First of all, Citibank's endeavor to comply with its contracts here is both a party to the financial agency agreement with Treasury and the account control agreements with the recipients and its endeavor to comply with both. Under the financial agency agreement, we're obligated to follow directives we receive from Treasury, implement account controls as required by EPA, and comply with fiduciary duties to the United States. And so when we complied with directives from EPA and Treasury to pause distribution of funds, we were complying with those contracts. Plaintiffs suggest in their brief that we should have continued making these distributions over and above the directives that we not do so, and we simply could not do that. We're an agent of our principle. We can only act as directed by the United States, and plaintiffs are certainly aware of that. Our status as financial agents is referred to in the account control agreements, and the grant agreements refer to the FAA. So that's my first point. And then the second point is there's a suggestion in the plaintiff's brief that they can continue their claims in this case against Citibank alone, even if they don't have jurisdiction to pursue those claims against the government, and I just don't believe that works. If the government has sovereign immunity with respect to the claims in this court with respect to the claims against it, Citibank would have derivative sovereign immunity with respect to the same claims. But the sovereign immunity under the Supreme Court's decision in Yearley excludes liability of the government representatives lawfully acting on its behalf, and if court were to hold that the directions were not lawful, then you don't have sovereign immunity, do you? Well, I think we still would, in the sense that even if they're pursuing claims against EPA in this case, arguing that EPA claims are unlawful, even if those instructions are unlawful, the government has sovereign immunity with respect to claims for specific performance in this court. Those are the exact same claims they're pursuing against us, and so I would think we would have derivative sovereign immunity with respect to those claims because the government would as well, regardless of the law. Even though your client is a private party that's contracting with a private party plaintiff, it would have immunity against the district court's jurisdiction. I mean, the immunity that the government has is substantive immunity. It's immunity against being pursued in the district court and going to the court of claims, but that's not a forum-style immunity that you need or have. So it would seem that one answer to that would be, well, it's not a substantive immunity, so if they're going there, the plaintiff should be able to see you in the district court. Maybe there's a timing question, and I see that there's arguments about stay. Wouldn't the most that you'd be entitled to would be a stay of claims against Citibank until the court of claims proceedings against the government were concluded? We're completely fine with that release. I'm not going to say no to that, and that would make a lot of sense, but I just would also make the point that I do believe there are substantive reasons why we could be dismissed regardless of what happens in the court of federal claims. That includes the right of sovereign immunity, but it also includes a contractual defense, which is under Section 6B of the ACA. It says very clearly that Citibank can't be held liable for failing to perform due to an act of government authority. So I do believe we have independent contractual defenses that we can invoke even if the government's actions were not being lawful. Wouldn't that substantive argument be a reason for vacating the preliminary injunction against Citibank, but not necessarily dismissing suits? In this posture? In this posture, that's right. But then what would Citibank have the latitude to do that it doesn't have now? It would have the latitude to respond to a request from the government to retract money. Again, we would be still subject to the directions of our principal, the United States. So why would that be an argument to lift the preliminary injunction against Citibank? Again, if the government presumably, if there's no preliminary injunction against Citibank, and there's no jurisdiction over the claims against the government, then we will be subject to their directives. Mr. Roth has said they're going to cancel the FAA, and we'd be obligated to return the money to Treasury at that point. So why would it be appropriate in the context of this case where the plaintiff's claims are pending for the preliminary injunction to be lifted? It seems like Citibank might not welcome that because it would expose you more sharply to conflicting directives if you return the money and then are ultimately liable under the contract. It is certainly easy for us to have judicial orders governing our conduct in this situation because we just want to comply with the contracts and want to comply with directives we're receiving from court. So I don't necessarily want to run away from clarity from this court or the district court about how we're going to deal with this case. But what I'm saying is, on the merits of a contract claim against Citibank, at the end of the day, there will be defenses for Citibank that we'll be able to invoke to show we've not violated the contract, even if the government's claims are deemed immoral or the government's actions are deemed immoral. Thank you very much. Thank you. Mr. Allen. Good morning, Mr. Unikowski. Thank you, Your Honors. May it please the Court. The government scarcely disputes that it has acted unlawfully from start to finish in this case, beginning with the FBI-directed freeze of plaintiff's assets even in the absence of a court order to the precipitous termination of the entire program on the literal eve of the TRO hearing. EPA has no direct authority  and no statutory authority for its actions. Those actions plainly violate the governing regulations, and EPA's precipitous termination of the program reflects the quintessence of arbitrary and capricious agency decision-making. Rather than seriously defend the legality of its actions, EPA rests on a jurisdictional defense. It claims that plaintiffs had no access to judicial review in any form of their constitutional, statutory, and regulatory claims, and plaintiffs' sole remedy is a breach of contract action in the Court of Federal Clearance. Yes, Your Honor. Mr. Nikowski, so I take one of, in your brief before this Court, you relied very heavily on the idea that the grantees have title to this money. What is your best evidence of that in the grant agreement, which is very complicated, and obviously EPA and the government retain a number of rights with respect to this money? Sure, so I direct the Court to pages 1134 to 1136 of the Joint Appendix, in which the grant agreement defines the money that's received from Treasury as a form of program income. So the Court can see on JA 1134 at the right above the italicized sentence, the definition of program income, says full amount of the capitalization by non-exchange capital contribution must be recognized, reported, and accounted for as program income. And then you'll see a little bit below that, it says program income, 2 CFR 200.1 defines program income as gross income earned by the non-federal entity. And so the grant agreement is actually defining the money received at the city bank account as a form of program income. And you can see that again, it says that in a few places. So JA 1135, I'm sorry to go through this quickly, there's a lot of small print here. But program income doesn't mean that the grantees have title to it. No, I think it doesn't, sorry. But I mean, there are lots of other provisions, for instance, like the closeout agreements, right, that, you know, grantees can't take the money and put it into another account until the government has closed out the agreement. And there are lots of other, I mean, you know, you can pick out this program income part, but there are lots of other evidence that EPA has control over this fund. No, I respectfully disagree. So I'm happy to talk about the closeout provisions. The two most pertinent provisions are on JA 1136, where at the very bottom, where it says once the closeout agreement goes into effect, the recipient will be entitled to transfer any remaining funds in the deposit account to an account at a financial institution of its choosing with a condition. And then there's one more at the bottom of JA. That's only after a closeout. Right, so in response to your owner's comment about the closeout agreement, it basically says you can keep the money. And that also, you see that in JA 1122, it explicitly says that. It says, after the end of the period of performance, the recipient may keep and use program income. So that closeout agreement is governed by, I mean, the government sets the terms of the closeout under the contract. So whether it gets closed out and how it gets closed out is within the government's control. So that suggests the grantees don't have title, perhaps, until such an agreement is done, and that agreement is within the authority of the government. Again, I would respectfully disagree. I think program income belongs, under the general definition in the Code of Federal Regulations, program income belongs to the grantee. And here, the grant agreement is defining the money that's dispersed into the account as a form of program income. So the regulatory definition of program income is program as, quote, gross income earned by the non-federal entity. In other words, it belongs to the non-federal entity. And here, the grant is defining that money in the city event account as a form of program income. I'm sorry. So I guess, I mean, this is a complicated agreement. So I guess I'll ask you the same question I asked Mr. Roth, which is, if there is a dispute about who has title to this, and your argument turns on having title to it, why isn't that a contract question that should go to the Court of Federal Claims? Because I think there's an antecedent question as to whether we're invoking a property right in which we would have access to judicial review. And to determine whether the district court has jurisdiction, I think it has to answer that antecedent question. So, land versus dollar actually has language on this issue that's quite pertinent to this dispute. So there's this question in that case where the plaintiff against the government was alleging that certain securities that were common stock and the possession of the government was theirs. And then the government was saying no, under this contract we get to keep it. That was the fundamental dispute. And so there's this threshold question about whether or not the plaintiff actually had the property right. And the Supreme Court held that that was a question for the district court. It had to determine these property interests before the case went to the Court of Federal Claims. And Megapulse specifically relies on land versus dollar as the basis of its distinction between cases that go to the Court of Federal Claims and cases that stay in the district court. So if there's some question in the court's mind about whether we have this money or not, I think the district court has to answer that question. We think it already did, but the court feels additional analysis is needed. That's a question for the Article 3 court. And if we're right about that, then this case stays in the district court. It's not just the grant agreement, by the way, Your Honor. It's also the ACA and the FAA, both of which say that the accounts are in our name and the EPA holds a security interest. I think it's just a basic principle of property law that the entity that holds a security interest doesn't have title. They have a limited ability. On that reasoning, can you recharacterize any contractual claim as a property claim? You know, the government says the real question is were they entitled to terminate the grant? And that is a question of contracts for which you have to look at the grant agreements and ACA and FAA and all these other contracts. I guess I don't think so. I think this case differs fundamentally from cases like Cusco and DOA versus California because in those cases, what the plaintiffs were asking for was money from the Treasury. I mean, they said they were asking for injunctions to prevent the government from stopping the money, but like there's a double negative there and that really just means they wanted money from the U.S. Treasury. And so I guess you could call the right to money from the Treasury a property right, but that's the type of property right you're supposed to vindicate in the Court of Federal Claims, which is a direct forum to ask for money from the Treasury. Here we're asking for something quite different. Our position is that this is already our money. I've quoted you the pertinent provisions of the grant. I think the ACA and the FAA also make quite clear that the government has a security interest, but otherwise it's our money, and we're seeking to vindicate our property interest in that money. I just want to put on the table, by the way, in case the Court had some concern, EPA suggests that we didn't emphasize this argument in the district court. Actually, this was the core of our argument in the district court. I can just quote our filing, Docket 53 at 8. EPA disbursed the funds to plaintiffs and the funds belong to plaintiffs and their subgrantees and may be used by them in accordance with the awards. EPA does not own the funds anymore, although it retained a security interest as a security party. This is the argument we've been making from day one in this case. What source of law, on your theory, what source of law are they violating here, even assuming this is a property right? Sure. I think there's three sources. There's the statute, there's the regulation, and there's the prohibition and arbitrary and capricious agency action. I'm happy to go through each of those one by one. One thing you could have said but didn't. Once you say property, that suggests takings. You didn't make that. We have a due process claim that's still pending in the district court. In the TRO, the district court found a likelihood of success on that claim, but the district court didn't address it in its preliminary injunction order. From our perspective, that's still a live claim. I think maybe a takings claim. We haven't put it in the complaint, but we framed it as a due process claim that infringes on our property interest. That's still in the case. We just haven't focused it on appeal because that wasn't the basis of the district court's preliminary injunction. The reason I'm raising this property issue is that the dividing line between jurisdiction ... The reason I ask, I'm not sure the line between ... Unless you assert a takings claim, I'm not sure the line between contract and property matters. You cite land versus dollar, which seems like a pretty good case for you, but then there's Larson, which the government probably didn't cite, but Larson is a case where the government acquires some property through contract and they're holding it, and someone sues the officer and the court says sovereign immunity because the officer is holding the property can construe the contract and even assuming his construction was wrong, construction of the contract, and the title to the land had passed to the respondent under the contract. Still sovereign immunity. The government doesn't cite that case. I'd want to look at it a little more closely, but I think that the ... A little unfair, but it is a major sovereign immunity case in the land versus dollar. I understand, but I don't think there's ... The question of who has title is governed by the relevant documents, and I think that they make it pretty clear, or at least it's for the district court to decide in the first instance who has title, because it's not just ... Let's say they do have title. Yes. You still need some source of law to indicate that what they're doing wrongs you. Yes, absolutely. Taking this off the table, Larson takes general law off the table. You can't claim a tort. They're tortiously holding the property. Then we're just back to the question, is this being done in violation of regulations, or is this being done in violation of the grant? Right back to where we started. I'm happy to talk about that. The reason I'm raising this issue about property and so on is that I think that Congress has channeled to the Court of Federal Claims where the plaintiff is just asking the Treasury to pay the money, and we don't think that accurately characterizes this case. All we're talking about in this discussion is which court is reviewing our claims. I'm happy to turn to the statutory and the regulatory and issues. I'll let you do that, but just one response on that, which is we're talking about the Tucker Act and contract claims, and it doesn't really matter whether the government's obligation is to pay money out of the Treasury, which triggers all sorts of other issues, or whether it's just any old contract obligation. If it's a contract claim, it's a contract. I definitely agree with that. I definitely agree that plaintiff cannot just seek specific performance of a contract in federal district court, even if it's not specific performance to pay money. I completely agree with that assessment. If I could say two things about that concern that Your Honor has expressed. First of all, I don't view what we're asking for here as... I'm sorry. I just didn't hear you. If I can say two things about the concern expressed by the court. First, I don't think we're actually asking for specific performance of anything. From our perspective, the government has already performed its obligations under the contract. The injunction ordered by the district court actually doesn't direct the government to perform any particular provision. It just directs the government to not interfere with our money. I actually think that specific performance is the wrong way to look at this case. It's more a matter of interfering with property interests we already have. Second, there's authority from... Interfering in a way that violates fill in the blank. The interference, it may violate the contract, but it also independently violates the statute and regulations. I think that raises our second point, which if I could just read from this court's decision in TransOhio, here's what it says. It said, a federal district court may accept jurisdiction over a statutory or constitutional claim for injunctive relief, even where the relief sought is an order forcing the government to obey the terms of the contract. That is specific performance. We don't think that this is a specific performance case at all, but even if the court conceptualized what we're asking for as an injunction speaking of specific performance, which we disagree with, as long as it's not specific performance to pay money, which is its own special category that goes to the Court of Federal Claims, we can ask for that relief, but only if we're not relying on the contract. We're relying on a statute or regulation. So I completely agree with the court. If we said breach of contract, specific performance, we couldn't come to this court even if what we were asking for wasn't money. But if we say violation of law, public law, and an injunction and we're not seeking money, I think that just the four corners of TransOhio and SHARP say that we're allowed to ask for that. I think this court has resolved this issue. Back to Judge Katsas' question about what the positive law is other than the contract. And I have read your briefing, I would have to say up until your latest one, but maybe concluding, was that it's agency action that's arbitrary and capricious under the APA, acting in this way without reason. And that's how I understood you framed the argument in the district court that the asserted reasons for terminating the award were contextual or contextual cover to shut down a program that was approved by Congress, that the new administration didn't like. But you frame in your Court of Appeals brief and maybe it's just a packaging question, you talk about an ultra-virus argument. And given the fairly solid ground for the pretext theory, I wonder whether is that just encompassed in your ultra-virus, is that just sort of a handy way of talking about an amalgam of additional statutory and perhaps regulatory claims or what? So that argument is an alternative argument to address the government's invocation of sovereign immunity. So the government says that argument was forfeited. We would respectfully disagree. You can see on JA-323 and 324 in the NCIF claimant's preliminary injunction brief. We specifically say, quote, it has long been settled that private plaintiffs may bring claims for injunctive relief for violations of federal law by federal officials under this Court's equity jurisdiction wholly apart from any federal right of action under the APA. And I'd also point out that one of the plaintiffs at Kelly is on that podium on behalf of today, inclusive, at page 31 of their preliminary injunction brief, have a whole section called EPA's actions were ultra-virus because they exceeded the agency's statutory and constitutional authority. So these arguments were preserved. But we're making that argument as a threshold argument regarding excuse me, as an alternative argument about sovereign immunity. We say both in the alternative that there is no sovereign immunity at all because we're bringing a claim against a federal official for violating federal law and not asking for money from the Treasury. And then second, even if the government would otherwise have sovereign immunity, the waiver in 702 applies. So they're just two different ways of addressing the government's sovereign immunity argument. So yes, I don't think we're making a new argument. I think we're making the same arguments below as we are here. And again, the affirmative source of law in which you're relying in answer to Judge Katsas' question is? So there's three different sources. There's the GGRF itself, there's the applicable regulation, and there's the arbitrary and capricious agency conduct. So if I can go through those briefly one by one, the statute itself does not authorize EPA to do this do-over after the September 2024 deadline has expired. I think the EPA has just divested of authority to do that. Now, I understand that... Yes? That argument, I mean, it's the nature of grants in general that they're, you know, the executive branch and different agencies issues grants under various conditions. If those conditions are not met, they may take back the money. And then, you know, that's sort of an ordinary process of grants and then the executive can re-obligate the money, presumably, even if, you know, the appropriations was for a particular year. I mean, they took the action, they obligated the money, and if a grantee doesn't meet the terms, then they can re-obligate. That just seems like an ordinary way that grants in the federal government work. So I completely agree with the court that if there's a violation of the terms of the grants... I understand you deceived that, but... Definitely, the agency has statutory authority to enforce the terms because the statute says that the agency is going to give out grants. All federal grants, as your Honor states, have terms and conditions associated with them. And that's important to protect the public. Of course, obviously. I have no dispute that if there's fraud or anything like that or any violation of terms and conditions, it's consistent with the statute, determined because the statute says that the EPA will award grants. That just presupposes that the grants can be enforced. So if the grant has been violated, of course it can take back the money. And the way this program was structured was EPA contemplated there might be a situation where a grantee violated the terms and the money had to come back. And so it was structured so the money would go to another one of the grantees pursuant to the original grant. So you wouldn't need to re-obligate. You wouldn't need new grants. You can rely on the existing grants to re-obligate the funds from the terminated grantee. That's how the program was intended to work. So we are completely in agreement that agencies always have authority to terminate grants pursuant to the terms of the grant. Something very different happened here. EPA has consistently said, including in the district court, that it's not relying on any violation of any terms and conditions. It's just relying on this like in the ether freestanding authority based on executive power to terminate grants it doesn't like. And I don't think that there's any provision of the statute that allows it to do that. Maybe I also may say one other thing about the re-obligation. That's an argument about whether the termination was valid. It's not an argument that they violated the statute. I mean, if you agree that the government can terminate and re-obligate grants generally, then the question of whether they did so lawfully here is a question about the terms of the grant. It's not a question about the statute. It doesn't say anything about it. And certainly the Constitution doesn't say anything about this. Well, the Constitution says that under the Appropriations Clause, Congress has the power of the purse. And if Congress decides that the grants are going to be awarded by September of 2024, then I think that the executive branch... But you've already said that they could, if the grantees were violating the terms of the grant, they could do any of that. So that would, in your view, also be contrary to the statute. No, I think that the statute authorizes the EPA to terminate under circumstances in which the grant would otherwise permit. But here, EPA has not even taken the position that the grants would otherwise permit. They have made a very different argument, that irrespective of what the grants say, there's just this inherent authority. Termination letters say that there's just this inherent authority that the executive branch has to terminate and re-obligate, irrespective of whether or not the grants would otherwise permit. And that is what we think exceeds the statutory authority of the EPA. I mean, it would be helpful if I talked about this re-obligation argument that EPA is going to make. You're suggesting that EPA is not making any argument based on the terms of the grant? They're only making an inherent authority argument? I don't know if that's a full reading. I think the district court expressly found in its decision that there was a concession. You'll see on page 982 of the joint appendix, the district court expressly points to the specific place in the government's brief where it says this is not a case about breach in any terms and conditions, and also quotes the government's lawyer. And so, yeah, there's this finding that the government wasn't making the argument. And moreover, we still have no idea what term and condition were even arguably alleged to have violated. So, you know, the government has throughout this case repudiated the idea that there's some term and condition that's been violated. And the district court made a finding on this issue that the government has not contended in this court is clearly erroneous or even erroneous at all or an abusive discretion. So I think as this case reaches the court, there's this almost undisputed finding from the district court that the government is not relying on any breach of any term and condition. And it certainly hasn't identified any. There's this very general language in the library that maybe something bad has happened, but we've never, none of the grantees has ever been told what they did wrong at all. And so I think the question in this case is whether EPA has the authority to just terminate the whole program and re-obligate the funds just because it disagrees with the decision of the prior administration. If I could say one word about this re-obligation issue. So, you know, for the first time in the Reply, Brief, and Appeal, EPA has finally explained its theory as to why it thinks it can re-obligate these funds. And EPA relies on this GAO decision that represents that the government has a right, even after the deadline, to order a replacement grant to continue the prior grant. Okay, so first of all, you know, this court has never agreed that there's this non-statutory exception to statutory deadlines, but even accepting GAO's guidance as gospel, I still don't think it helps the government here. So the GAO Red Book, which is, as I understand it, the Bible in this area for GAO lawyers, says that the re-obligation can only occur if the alternative reward amounts to, quote, excuse me, it's quote, substantially identical to the original grant. Okay, and so the example given in the Red Book is that when a professor at one university was doing research pursuant to a grant, and the professor moved to a different university, the grant could also, in doing the exact same research, the grant could also be moved to the second university because the grants were substantially identical. It's just the researcher was at one university versus another. Here, I'm not sure why this matters. There might be an open question, assuming that the termination is lawful, then there's an open question about whether they can re-obligate the grants. That doesn't answer the question whether the termination is lawful. Suppose they couldn't re-obligate the grants. You wouldn't take the position that they'd be barred from terminating for criminal misconduct. Of course not. The lawfulness of the termination is different from the lawfulness of whether they can re-obligate, assuming a valid termination. The reason this is relevant goes to the government's argument that the correct remedy here is an order maybe directing re-obligation of the funds, but not an order in joining the termination. It seems the government has two options. One is to re-obligate the funds in a manner substantially identical to the existing, which the government says it wouldn't do. If it's really going to do that, it just goes to show that the terminations were arbitrary and capricious because the terminations say that there's a misalignment with the agency's policy priorities, which necessarily makes it arbitrary and capricious to give substantially identical grants. It seems to me either the agency will re-obligate in violation of the appropriations deadline or just impound money, but whatever the agency does, it's going to be illegal. That's why we're saying that the correct remedy for what we do is a violation caused by the termination and the freeze is to simply avoid the unlawful agency action, avoid the terminations, as well as the clawback of the money. That's the relevance of it. It just has to do with the government's proposed alternative remedy. If the district court's injunction is lifted, what happens next? Will you be able to keep litigating? Well, as I understand it, if the injunction is lifted, EPA has represented at the podium that it's going to ask Citibank to wire all the money to the Treasury. We don't think that's lawful at all. There's no notice of exclusive control, nor has EPA suggested it can do that because it can only do that based on certain criteria that EPA has not suggested are satisfied, but Citibank has also taken the position in this court and on the podium that it will do whatever it is that EPA tells it to do. And so, judging by the representations of counsel, the next step is that EPA is just... If everything is lifted, if all the injunction is lifted, EPA is going to say, Citibank, wire our money back. Citibank's going to say yes, regardless of the legality of that action. Do you have any sense of how long that takes? No, I don't. I think it would probably be pretty fast. We would like the court to continue at least having the administrative stay in place to prevent this case from potentially being mooted by that action. I mean, why would it be mooted? If the grantees were to prevail eventually in the court of federal claims or before the district court, I mean, neither Citibank nor the federal government are insolvent to recover the funds eventually. Well, that's certainly true. I mean, you could recover from either or both entities, as the court determined. They're not going out of business. Right. So I certainly hope the United States is not going to go out of business, Your Honor. So if the court were to send us to the court of federal claims, obviously, we would litigate there and we would seek the full amount of the award. However, there's... And would the plaintiffs continue operating? No. So there's findings from the district court. Those are just entities that were created to receive federal funds. I don't understand what sort of inviolable status that would have. Well, the point is, first of all, if the termination of the program goes into effect, these entities can't carry out their work. They can't carry out their work under their grants. I mean, potentially, they could go to the court of federal claims and just seek a whole lot of money. But first of all, that would take, you know, potentially many years. And also, they wouldn't be working with EPA. The whole point of these programs is not just a boatload of cash. It's that they're working with EPA to implement Congress's purposes in the GGRF, and sort of waiting several years to obtain a large pot of money. They would still go out of business. There'd be still the reputational harms the district court concluded, which are based on factual findings that are not clearly erroneous. But if the money were to go out, and then the government were to ultimately prevail, the government would be out of these billions of dollars. Because there's been no bonds, and nobody suggests that this money could be recoverable by the government. Isn't that harm more irreparable to the American people, to the federal government? So first of all, these are green banks. They're not just, you know, giving money. They're giving loans, which are going to be paid back. So it's not speculative to suggest that this money is all going to disappear. Second, if they... But government could recover this money if it were to be disbursed. Well, it's true that if it's disbursed, we don't think it could be recovered directly from the people it's being disbursed to. But we're giving loans, which are being paid back to the entities. So, you know, there's potentially, you know, the government could recover it at a future point, whatever money is in the Citibank accounts. But just look, Your Honor, if the concern is wasteful sending, then there's a number of protections that exist. From the podium today, the government's counsel suggested that perhaps there's insufficient oversight, being a few new arguments in the case. I direct the court to some of the declarations in the record describing the very extensive oversight, which is actually much more than the oversight that exists when they're just withdrawing money from the Treasury. That's a J372-374. If the concern is about subgrantees, unlike the typical arrangements, the subgrantees have accounts at Citibank, which are also being monitored by the government. In fact, one of the good reasons for this structure is that it gives the government oversight over the subgrantees' actions. So if the concern is fraudulent or wasteful spending, then I think that there's no real concern for the government. But that's not a decision for this court to make. Well, in the balance of the equities, if we already have a likelihood of success on the merits, I think we have shown equitable harm. And if we get past those hurdles, as the district court concluded, then the next question is the balance of the equities. The government has raised the concern that there's going to be fraudulent or wasteful spending, and that's an equitable case to deny injunction to protect the taxpayer. What I'm saying is that there's extensive evidence in the record, and the district court made a factual finding that's not clearly erroneous, that there's adequate protections to ensure that that equitable interest asserted by the government is not significant enough to withstand the irreparable harm and the likelihood of success that plaintiffs have established. So it's only relevant at that stage of the inquiry. Can I ask about your APA theory? You cite the duty of reasoned decision-making. Is there any contract claim that is obviously proper, obviously channeled to the Court of Federal Claims through the Tucker Act? Yes. For which the counterparty couldn't just go to district court and say, well, I want to argue that the termination was not reasoned? Sure. So with respect to that claim, not the regulatory claim, which I haven't talked about, which is in our brief, or the statutory claim, but specifically on the arbitration... Reasoned decision-making. Yeah. Specifically on that claim, I do think our claim ultimately hinges on the view that we're not seeking money from the U.S. Treasury. So as I read a case like Dewey versus California, the plaintiffs in that case essentially alleged that the termination of the grants was ill-reasoned and they sought an injunction to stop the government from not paying the money from the Treasury. So the Tucker Act is not exclusive for any government contract not involving payment of money. The problem with your theory is if you're right here, contracting parties can always do that. No, that's not the case. Because if we were just coming to the court and saying the government breached the contract for an arbitrary and capricious reason, please enjoin the termination and allow us to continue getting paid by the Treasury. We would lose that case. And the reason we would lose that case is that you'd look at the text of Section 702 of the APA, which says that the Tucker Act impliedly forbids the district court from granting the relief the plaintiff seeks and the claim is borrowed. And you'd say, look, there's already a form that exists in which you can argue for an order for money pursuant to a contract as a result of a breach directly from Treasury. So you can go to the Court of Federal Claims and say, I want money from the government because of the breach. And this court has held that that's your remedy, that's what you're asking for. You have Congress provided a form where you can ask the court to give you money from the United States and if that's what you're asking for pursuant to a contract, that's where you go. And I think that's very different from a case when we already have the money. We're not trying to enforce any kind of money mandating provision, which was at issue in the DOE versus California case. If you look at the key sentence in that case, the court says that a district court cannot enforce a contractual obligation to pay money, and it cites the Knudsen case. And so I think that's totally consistent with the text of Section 702. Okay. And I got that. On the reg? Yes, Your Honor. If a regulation imposed a freestanding obligation on the government with regard to a contract, you could argue the reg in district court. Yes. But how could you make that sort of move with regard to a reg like the one here, which says one permissible ground for termination is whatever is specified in the contract? You can't resolve lawfulness You can't find the termination unlawful by looking at that reg without just going right back to the contract. So I respectfully disagree. It's true that you have to take a peek at the contract, but we're still trying to enforce the reg. So what the reg is saying is that so 200.340b says that the federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the federal award. And then going up a step, 200.340a4 says that the federal award can be terminated pursuant to the terms and conditions of the federal award, including to the extent authorized by law, if an award no longer effectuates the program rules or agency priorities. So reading those two provisions together, there's a freestanding regulation that says that the agency is not allowed to terminate any contract based on new agency priorities unless it says that in the terms and conditions. In other words, there's a default that says that unless it's term and condition of the grant. Well, but it's a separate regulatory constraint. So here's a hypothetical that might be helpful for the court. Suppose Congress enacted a statute that said that it is illegal henceforth for an agency to terminate any contract based on changed priorities unless the contract explicitly authorizes the agency to do that. I think that that statute would be enforceable in federal district court because you'd be making a claim based on the statute, not on the contract, even though the statute requires you to take a peek at the contract. And that's this case. It's more than a peek. Well, yeah. The reg or the statute in your hypo is just a pointer. Well, no, it's a constraint. It's a constraint on what the agency can do. It says the agency can't terminate based on new priorities unless the contract explicitly authorizes it. But in the absence of such language, it's an independent statutory prohibition. So I think if you... If the reg said... There's a termination reg which says agencies may terminate if and only if the ground is specified in the grant. And that's all the reg says. You think that would support an APA action on the theory that the necessary and sufficient and dispositive analysis of the grant, lawfulness of the termination under the grant, establishes lawfulness or not of termination under that reg? So I think that might be a harder case than this, but my bottom line answer is yes. I think an agency is allowed to constrain itself in two different ways. It's allowed to say we're going to create certain contractual guarantees, which are sort of private law arrangements, and then it's going to separately have this public law provision, enforceable under the APA, restraining the agency from acting for certain reasons. What's harder about... I didn't hear a difference. Just so that I can follow where you're going. I didn't hear a difference between the hypo that Judge Kass has... Or your hypo, I guess it was. EPA cannot terminate any contract unless the contract says... kept on the terms that the contract says. And I took Judge Kass's to be saying, well, what if there was a regulation that says agencies may terminate only if the grant... So the reason I said it was harder was not because of the statute regulation distinction. I think those are actually identical. Yeah. So the reason I said it harder... I read 200.340 to have changed the pertinent regulations to make it specifically harder for agencies to terminate based on change priorities. That's why in 200.340 A4, the reg says that it can only terminate pursuant to the terms and conditions if the award no longer effectuates the program goals or agency priorities. So the practical effect here is that the agency... Maybe the practical effect of this reg is that the agency cannot terminate based on change priorities unless the contract explicitly says that the agency can do that. And so because the regulation specifically references terminations based on change priorities and puts what we understand to be an independent constraint on the agency's authority, we think this looks more like a public law case. But I do think... I mean, my answer to your hypothetical would, in the end, be the same. As long as we're enforcing the regulation, the fact that the regulation has language similar to the contractual language, I don't think makes a difference. The Tucker Act cases are a little bit messy, to be sure. But one principle that seems to be a through line is that you can enforce statutory or regulatory rights in district court to the extent they exist independently of the contract. And maybe the hypo wasn't clear, but it's just designed to posit a case where the regulatory right is entirely dependent on what's in the contract. Your answer seems to be it doesn't matter. Well, I guess it depends on what we mean by independent. So I think the Sharpe case... I'm sorry to exceed my time so significantly. I think the Sharpe case is quite pertinent. The court held that Section 702 waived sovereign immunity for a due process claim even though the claim rested necessarily on the premise that the contract with the government gave him a constitutionally protected property interest. That's not just my spin on the case. I'm actually quoting TransOhio's description of the Sharpe case. So the court held that even when a claim rests on an underlying breach of contract, as long as that's a genuinely independent claim based on some other source of law, like due process, or in this case a statute or a regulation or the APA, that claim is able to proceed. So I certainly understand the point that there's this... The grant is the but-for cause of our claim. We wouldn't be here today if we didn't enter into grants. But I don't think that's the analysis. Yes, Your Honor. Can you talk about your constitutional claim and if we were to disagree with you on your regulatory and APA claim? Yes. Would you have a constitutional claim as an independent ground to support the preliminary injunction? Yes. And so, I mean, the district court did find the likelihood of success on that claim so it wouldn't be an alternative ground. It would just be affirming that for Sharpe... That is an alternative to your... Among your arguments, is it alone sufficient? It is alone sufficient, Your Honor. We think that just Section 7434 does not authorize the agency to redo the entire... to just terminate the whole program and redo the entire program after the deadline expires. So what's the constitutional... Yes. The constitutional argument is that under the appropriations clause, Congress has the power of the purse, and specifically on appropriations provisions, agency has to abide by them and not exceed deadline... go past deadlines nearly because the agency... If every time the executive branch allegedly fails to comply with the statute, that's a constitutional problem? No, I don't think so, Your Honor, but this is a special statute. This is an appropriations provision. I mean, but that's true of anything. I mean, if Congress has the power to do it, then the executive branch doesn't have the power to amend it or repeal it or ignore it. I mean, that's a statutory claim. Every time that someone alleges that an agency has failed to follow a statute, I mean, why is that a constitutional claim? So let me try a different answer in addition to the appropriations clause issue. So in Aiken, this court classified the Aiken case as a separation of powers dispute. Even though in some sense the agency wasn't violating the statute, the gravamen of the agency's argument there was that even though there's a deadline, the agency just didn't agree with the deadline and just decided not to follow it. And because that's how the agency framed its position, not grounded in a dispute over interpretation, but an assertion of freestanding executive authority, that turned it into a type of separation of powers case. I think that's quite similar to what EPA is doing here. Aiken is really an Article II case. It's not some sort of free-floating separation of powers argument, right? It's a question of, you know, does the executive branch undoubtedly have discretion to decide how much to enforce the law? And I think then Judge Kavanaugh's position in Aiken was that this is not part of the enforcement authority where Congress has mandated that something occur at a certain time. Well, I think that there's a similar type of analysis that happens here because we're not really disputing the meaning of any particular word in Section 7434. I mean, it says what it says. It says September 30, 2024. And the question is whether under Article II the president has the authority to just say, I'm going to redo this whole program even if I'm not actually enforcing the terms of the grants just because of a disagreement. But you've already said earlier in this argument that executive agencies can terminate grants for a variety of reasons that might be based on the grant or a regulation or some statutory term. And so then we're just back to whether the termination was false. Well, but there's a difference. So sometimes the agency will assert, I mean, it's a difference of degree, I think, when you get to a statutory dispute to a true separation of powers dispute. Sometimes an agency will assert some statutory or regulatory authority. They'll say there's a breach of the terms and conditions. They'll say a statute permitted it to do something and then the grantee or someone else will disagree and then you just tee up a dispute over what the statute or the regulation is. And I agree that, you know, if that's a constitutional claim, everything's a constitutional claim. I concur with the court on this. And that's not what's happening here? I don't think that's what's happening here for two reasons. First of all, the appropriations clause that you've already raised. And second, I think that the agency because we're talking about failing to follow the conditions in an appropriations statute here. So I think the appropriations clause treats appropriations statute in a special way. So, Mr. Rothfuss, there's no obligation that they spend all of this money. So I respectfully disagree. I mean, this is an argument that came for the first time in the reply brief and actually EPA doesn't even say it. It just says elliptically that maybe they don't have to spend it. I mean, we haven't litigated the Empowerment Control Act here. Are there any cases saying that it's a violation of the appropriations clause not to spend money? Yeah, I think that is absolutely a violation of the appropriations clause. Are there any cases saying that? Well, I don't think that this has really been litigated because of the Empowerment Control Act. Usually the appropriations cases are about making sure the money is spent. I mean, they're not about this failing to spend money. I guess it's a violation of what the appropriations means. We think that even in conjunction with the Empowerment Control Act, the agency does not have the power to not spend these appropriated funds. We view that as an impoundment, which is contrary to the conjunction of the statute and Empowerment Control provisions. The fact that it would be an impoundment or inconsistent with the statute is just based on your view that the termination of these grants was invalid because you agree that despite the statute that says they have to spend this money by September 2024, they've spent the money. And if there was a violation of the grant, they could terminate that and possibly re-obligate the funds. I mean, you agree that they can do that under the statute. So the question is only did they properly do that in this case? But I don't think the parties are litigating whether or not the terms of the grant permitted the government to do what it did. The government has never said that. If you look at the basis for the government's order, if you look at the basis for the government's action in the termination letter, it just says there's this inherent free-floating authority to reconsider actions. But you agree that under the statute that the government, at least in certain cases, has the authority to terminate the grant. So then we're not talking about the appropriations clause or constitutional claim. We're just talking about whether the termination was valid on the facts here. You've agreed that they have the authority to do it. So let me just say two things. First of all, even if we're talking about a statutory versus a constitutional violation, we're also asserting a statutory claim. So if the court thinks that this is better styled as a statutory argument versus a constitutional... My question is the same. You've conceded that under the statute there are circumstances in which the government has the authority to terminate these grants. And so then the question is just, did they properly, lawfully terminate the grants here? That's not a question about the statute. It's a question about the grants. Because you've conceded that under the statute, they have the authority to terminate. I think the question is what authority is the government exercising here? If the government is purporting... What authority is saying it exercises or purporting to exercise? No, the authority that's... It's hypothetical. Suppose EPA simply announced that it doesn't care about what the Act of Congress says. It's the unilateral authority to terminate contracts at will. And so it's just going to do it because that's just a core Article II power. I think that that would raise separation of powers and constitutional issues. You wouldn't say, well, you have to just look at the statute and whether there was some justification under the statute. You'd say, if the purported exercise of authority was this freestanding authority that's untethered from the statutory limitations, whether that authority exists I think would present a constitutional question. I think that's not so far from what happened here. EPA is not even purporting to ground its action in the terms of any kind of grant. It's saying it has some authority independent of the terms of the grant just based on its articles. No, this is a termination given number of reasons for why the grants are being terminated. Are you just... Are those irrelevant or do we think they were in a bad place? Does the government not get a presumption of regularity? They have given a number of reasons. I understand grantees find them insufficient but they have given reasons. The reasons have nothing to do with the terms of the grants. They're just these very general statements that EPA would like more oversight and there's misaligned priorities. Those reasons have absolutely nothing to do with the grants themselves. EPA is really just saying... That's a question about the merits because you're not disputing that you've conceded that they have the authority to terminate grants in some circumstances. Those questions are just whether those circumstances are valid here. I think the question is whether... I don't mean to repeat myself but the question is whether EPA can assert an authority that's independent of the terms of the grants to end these entire program just based on change agency priorities even though the statute itself imposed a deadline for September 2024. The practical effect of this termination is either going to be the government impounds the funds which we think would be unlawful or it re-obligates to a whole new set of grantees which would also violate the statute which required a 2024 deadline or it gives substantially identical grants which really makes no sense and is inconsistent with everything EPA has said. I think no matter what EPA does going forward, there's going to be a statutory violation. That's only if the termination is unlawful. Right, but EPA has not actually defended the lawfulness of the termination pursuant to the statute or the grant. It's just said it's lawful because EPA has the authority to do it. What I've heard Mr. Roth say today just substantively as opposed to in terms of legal packaging is they concluded there was inadequate oversight mechanism and particularly of the sub-grantees. If that is their concern in your view, what are their options? Well, then there's certainly the option. So first of all I don't mean to not be non-responsive but EPA has never substantiated these concerns. There's very extensive oversight mechanisms. The oversight of the sub-grantees is far greater than when you have an ordinary withdrawal from the treasury in which you have no idea what the sub-grantees are doing. In fact, the ability to oversee the sub-grantee city bank accounts is one of the reasons that this program was structured this way. But if there's concerns about oversight, I mean, what's difficult is that EPA has never told us what the concerns are. I mean, there's very frequent check-ins every week we check in with EPA. There's a work plan that's been approved. There's full audits of everything we do. I mean, EPA 373 and 374 which enumerates in exhaustive detail all of the oversight mechanisms and auditing abilities that the EPA has. But if there is some concern that it's not enough, then all EPA has to do is tell us and we probably would try to provide additional oversight mechanisms pursuant to the existing grant or potentially there could be a mutual agreement to amend it. But termination of the grant as a whole we think is an unwarranted step. Morning. Good morning, Your Honors, and may it please the Court. Teresa Rive-Dippo on behalf of the State Green Bank subgrantees. We agree with the presentation of my friend and ask the Court to affirm the preliminary injunction in its entirety. With my five minutes, I'd like to focus on the aspects of the injunction that prohibit the defendants from transferring or moving the funds out of plaintiff's accounts at Citibank during the pendency of the litigation. That release clearly does not injure EPA, avoids irreparable harm to plaintiffs, and is a modest measure that appropriately preserves the status quo. What is the irreparable harm? This is actually really a broader question than just the state banks. They're concerned that they're going out of business, and as I think one of my colleagues said, if they were only set up by EPA to do this in the first place, couldn't they be reconvened if everything dried up and they went out of business and came back? Tell me a little bit about the irreparable harm here. A couple of things, Your Honor. First, as to the irreparable harm of not being able to access the funds while this litigation and EPA's conduct is ongoing, there are operational and reputational harms suffered by the plaintiffs, including for some of the plaintiffs, the prospect of going out of business. For the state green banks, we receive funding from other sources as well, not exclusively from this program, so our entities would survive the inability to access these funds in some cases, but we would still suffer the operational and reputational harms from the inability to access these funds. For example, being unable to perform investments that we had planned to do, and in some cases that would even result in us being completely unable to participate in those projects because a project delayed turns into a project denied. Could the state banks reimburse the Treasury or the federal government if the money was disbursed and then the termination was found to be lawful? Would they have the wherewithal to return the money to the government? To the question whether EPA could recover the funds if they were drawn down, I think there are actually some places in the record where the district court did consider that possibility, and because of actually the extent of the oversight on these accounts concluded that it wasn't a substantial concern. I think that's at JA 1002, and that's also in our papers below, in the state green banks papers below, at JA 1288, so not just that the oversight controls on the account would avoid sort of gratuitous drawdowns or spending that EPA couldn't get back, but also that the federal regulations authorize EPA to recover or disallow improper expenses. It's not just about improper expenses, but if it was found that the termination was lawful and that the government was entitled to all of the funds. The oversight question isn't relevant to whether they could recover money that was disbursed during the pendency of litigation. I think it would be relevant to how much money they would have to try to recover because, as I think has been discussed, the grantees and subgrantees have to certify that their withdrawals are to comply with or implement an EPA approved work plan, but to the question of whether they could recover rather than the amount they would have to recover, I think the federal regulations give an answer to that, and that's 2 CFR 200, 345, 346, and 410. But if I might just get back for a moment. That doesn't really answer my factual question about the solvency of the banks. If they were, if a court said that the government was entitled to recover the funds, could they get the money back from these entities? If these banks were able to access these funds, then they wouldn't have an insolvency problem. The money wouldn't be spent. If the money were spent, could the government get it back? I think that the federal regulations would provide an avenue for the government to pursue that. I suppose it's possible, but actually, if I might just respond to that by going back to the irreparable harm analysis as to the provision of the injunction that preserves the funds at Citibank for the duration of the litigation, because I think that in particular reflects that that provision would allow the avoidance of irreparable harm to plaintiffs without harming EPA or raising your honors concern about the possibility of funds being spent. That's because EPA hasn't expressed any irreparable harm or any substantial harm that it would suffer from the funds being preserved at Citibank during the duration of the litigation. There's this question today of whether they want to re-obligate the funds, but even the authority they cite for re-obligation, which is at page 17 of their brief about the ability to make replacement grants, says that those grants would have to be for the same nature and purpose as the original grants, and EPA hasn't, and I don't think can, provide an explanation of how making a replacement grant that is essentially a continuation of the original grant for the same nature and purpose would respond to its oversight concern. Conversely, preserving the funds at Citibank would avoid some of the irreparable harm that plaintiffs face because there's a prospect as discussed that the plaintiffs wouldn't be able to recover the funds at the end of this litigation even if they prevailed if EPA clawed the funds back. And that's not because the federal government might go out of business, it's because of the risk described in the amicus briefs of Professor Bagenstos and of the Natural Resources Defense Council that the funds would be unable to be recovered by the plaintiffs under principles of appropriations law. I'm sorry. Were you saying that as between lifting the preliminary injunction and not, you're obviously in favor of keeping the preliminary injunction in place, but I thought you said something about the stay. The stay includes a provision that says that the funds are preserved at Citibank. And I actually, maybe I should ask because I had a question about whether even that is tenable for the plaintiffs during the course of the litigation. I don't know if you have information on that. Other than that, state banks, which as you point out, have other sources of funding and would not face existential threat from this money's continued holding in Citibank. Some of the plaintiffs absolutely face existential threat, like going out of business from the inability to access their funds now. And is that a harm if, as Deirdre's questioning suggested, they are, like a campsite, you set up a tent for the night, you take it down, you put it back up again when you need it. If these entities exist only for the purpose of administering these funds and they prevail at the end of the day and get the funds, irreparable harm or not? Irreparable harm to EPA, is that? No, no, no. Certainly irreparable harm to the plaintiffs. The League of Women Voters case, I think, highlights that because it talks about when an organization can't carry out its mission or invest in the way it was intended to do, that's irreparable harm. And I think that's certainly the case for these plaintiffs. So the hypothesis is they would go out of business because they're created only to administer this money, and if you prevail, they would come back into business and be able to carry out their mission. So I think that the premise of the question is why is it irreparable harm if their mission is only vis-a-vis this money? Because in the interim, they suffer operational and reputational harm. In the interim, they're not able to carry out their mission because even assuming they could go out of business, fire all of their staff and turn off all of the lights and vacate the buildings and stop paying rent, even assuming all of that could be undone later, which I don't think is consistent with the findings that the district court made, they would still in the interim have been unable to fund the projects that they intended to fund, and also they would have suffered these reputational harms, which are particularly concrete and important in the context of the funding structure here, because this is all about leveraging and catalyzing private investment via having secure access to capital on the plaintiff's balance sheets, and if the plaintiffs don't have that stable access to funding, that signals to the market that maybe they're not as secure and reliable, maybe they're not the foundation of private investment that they were intended to be. If I might just add one point about the aspects of the injunction that preserve the funds at Citibank. I think that that is a tailored provision that could preserve the relative positions of the parties while this litigation is resolved. It's obvious, I think, that these Tucker Act issues in particular are tricky, and that this area of law is fast moving, but if the court at least ensures that the funds remain at Citibank, that avoids some of the irreparable harm to plaintiffs without harming EPA. And in the Department of Education teacher grants case, the federal government actually described that in order to hold the funds in place as a less onerous option to preserve the status quo. What would be the basis for preserving that part of the PI if we were to conclude that the district court lacks jurisdiction because this needs to go to the court of federal claims? If there's no jurisdiction, then there's no authority for PI, any part of it. I understand your position about why it would be reasonable to keep the money at Citibank, but what would be the court's authority? If the court completely disagrees on the Tucker Act issue, I think it is a harder argument to be sure. The court could leave the administrative stay in place to allow these issues to percolate further while avoiding irreparable harm, some of the irreparable harm that the plaintiffs face. Where would we have any constitutional authority to put a stay where we think there's no jurisdiction? Assuming we thought there was no jurisdiction, would there be any authority of this court or the district court to do a preliminary injunction or a stay? I think if the court is certain that there is no jurisdiction, this is a much harder argument. Harder or just completely foreclosed? What would be the argument that we have had jurisdiction to do those things? Is there any argument? If this court has no jurisdiction and is certain of that conclusion, I agree. It probably could not enter an administrative stay. We think that would be the wrong view for all of the reasons expressed by my friend and in the briefing. We ask this court to affirm. Thank you. I wonder if I could ask Mr. Unikowski to respond. It's my own failure to follow up. Just to have some concrete information about in particular that Ms. Dippo has expressed amenability to having an emergency stay that we entered stay in place and better than no stay, I understand, but I just want to have a more concrete sense of in terms of the harm to the plaintiff what's at stake. I think I understand if the criminal injunction is vacated that there's a question of whether there's any opportunity for you to seek any further review and that's really a question for Mr. Roth, but if the criminal injunction remains in place, the emergency stay freezes the money rather than as under the injunction makes it available. What's at stake there? Sure. First, I direct the court to the Belbacha case in which this court does say it has authority to enter a temporary injunctive while it's Belbacha, B-E-L-B-A-C-H-A, while it's assessing jurisdiction. I think the court can reasonably say if the issue is still percolating in this court, potentially in the main court, the stay is in place while the court continues to assess jurisdiction. Plus, we have other claims pending in district court like a due process claim. If there's potential or possible jurisdiction over that claim, I think a stay would still be appropriate. If I could just answer Judge Pillard's question directly. In terms of the irreparable harm, there's declarations from all the grantees and they're all a little bit different, but many of the grantees say that they're going to basically shut down within 30 days or less without the funds and they can't just pop back up. It doesn't work that way. For example, my client, Climate United, has several extensive declarations in the record describing how it has a number of investment professionals who are just going to leave and are not going to come back if the company just has to, or the nonprofit, excuse me, just has to shut down. Realistically, it's just not an option for these entities to shut down, fire or lay off all their employees, and then litigate for years in the court of federal claims. They're probably not going to come back. I'm not just saying that. I direct the court to the at least, our client has a declaration from Ms. Baffert and several of the other grantees as well. Justice Climate Fund has a detailed declaration, for example, as does Power Forward and several other grantees. Thank you, Reyners. Thank you. Roth? Thank you, Your Honor. I was hoping I could clarify one point and observe a couple of concessions and then comment on one thing that did not come up. First, on the clarification, my friend suggested that EPA has not relied on the terms of the grant as the authority to terminate the grant. That's not correct. The termination letter itself says, pursuant to EPA's authority under the regs, the general terms and conditions, the terms and conditions of the grant agreement, and the agency's inherent authority. It certainly pointed from the outset to the terms and conditions. I think EPA has been pretty clear from the outset of the litigation that in EPA's view, the terms and conditions of the grant as originally entered incorporated EPA's then existing general terms and conditions which provided for termination consistent with agency priorities. Then we get into a question of whether the modification... Is it an argument that the agency priority clause survives or an argument of waste, fraud, and abuse or both? It's both. It's number one that the more general termination authority survives and that the later modification that purported to strip it out was void or voidable. Then second, the original version also allowed for termination based on waste or abuse, which were not defined terms at that point, which could have then included a view that the structure of the agreements allowed for waste and abuse that, again, was purported to be further tightened after the election. Then we have a question of contract formation with respect to the modification. Again, we haven't developed all those arguments here because those are contract arguments. We will do that in the Court of Federal Claims, but the point for now is, yeah, it's a contract dispute about the termination provision. I just wanted to clarify that. In terms of the concessions, counsel said a couple of times it's not just about the money. It's about working with EPA on this program. You mentioned weekly check-ins and so on and so forth. I think that suggests two things. One, this is not just a historical contract where money was turned over and now it's all in their hands to go and run with. This is an ongoing relationship that's supposed to last for years in which all of the parties have obligations. That makes the remedy here look a whole lot like specific performance. I'm not sure what else it really could be. We could look at the order that the district court entered, which enjoins EPA from terminating plaintiff's grant awards. This is a grant award with a termination provision, dispute about whether that provision has been complied with. Then the district court is saying I'm enjoining you from exercising your rights under that provision. That is a contract claim. That's a contract remedy. That remains true whether this is a reimbursement or an advanced structure. They're still grant funds. They're still subject to disagreement. They're still subject to termination. The termination clause itself contemplates deobligating the uncommitted funds. This is a JA614, although it appears throughout the appendix. I'm not sure how they can square that language with the idea that, well, the money changed hands. There's no taking it back. The contract itself contemplates that under certain circumstances it can be reverted. It contemplates deobligating the funds under what circumstances? When terminated. When the grant is terminated. Again, we have a dispute over whether the contract has been terminated consistent with the terms. If we're right about that, they get nothing. If they're right about that, they get damages. We're not disputing that, but that has to be in a different court. Those are the two concessions because counsel also agreed that, yes, there is termination authority, at least under some circumstances, if it's consistent with the terms. It's not a violation of the statute of constitution. To be clear, because I think there was some confusion about this, we're not accusing grantees of breaching the contract, but we do maintain that EPA had the authority to terminate the contract under the terms and conditions. Two different things. And specifically invoking which authority? The authority under the EPA's general terms and conditions that were enforced at the time of the original grant agreement in 2024. And the contract said, the contract incorporated those and said, we're not intending to modify or supplant them. Those terms and conditions included the right to terminate based on change in policy priorities, as well as, and then the contract itself talked about the waste and abuse authority. Is the notice of termination accused? I mean, does it suggest that the grantees engaged in waste, fraud, and abuse? I mean, those are the reasons given for the notice of termination. I don't think it says it in those terms, Your Honor. The agency was certainly concerned about the program integrity, the award process, and fraud, waste, and abuse. But the accusation is not that a particular act that constitutes fraud, for example. Again, as I was explaining earlier, the concern was a more structural concern about the way these grant agreements were set up and administered and the EPA's lack of oversight tools to ensure that the money wasn't abused. Two other quick things, if I may. I did not hear... Just help me out. Sure. What is the basis? I understand the argument about whether inconsistency with agency priorities is a valid basis for termination. What is the argument... What is the basis... What is your claimed basis for termination on the theory that there's no breach, there's no waste, fraud, or abuse, but there's a contract structure that might facilitate that? I'm not sure I see that in the grant agreement. Effective performance or adequate evidence of waste. Right. So the argument there... I mean, I think the initial argument is the one Your Honor referred to first, which is we don't have to rely on that specific language. If we were forced to rely on that specific language, I think the argument would be that the waste and abuse is the structural risk of waste and abuse rather than a particular instance of waste and abuse. And look, maybe the Court of Federal Claims will say that's a bad argument. You can't terminate under these conditions. And then we'd be in the world of what are the relevant damages? And plaintiffs would establish what their losses are, and the government might be on the hook for that. But that should happen in that form subject to that remedy and not what is effectively specific performance of forcing EPA to go through with this involved multi-year process where they are signing off, approving, engaged in these weekly check-ins, and so forth with the plaintiffs when EPA has determined that the structure of these agreements is inadequate. So if we disagree with you that EPA retains the authority to cancel an award that no longer effectuates the program goals or agency priorities, you don't have a claim. Well, Your Honor, I think that question is not the questions before the Court. No, no, but I'm trying to understand if we... Mr. Yudhikashi has argued that what you purport to be doing is actually relevant to the nature of this claim. And you're making an argument we purport to be doing something that's under the contract, and therefore we have to go to the Court of Claims. So I'm trying to understand the surface plausibility of your argument that you were trying to do something under the contract. You've argued that you have this authority to terminate a contract if a grant, if it no longer effectuates the program goals or agency priorities. You said, well, that was taken stripped out of the contract at a time that you think is shady, so you would have to show that that was invalid as a legal matter. That doesn't sound like a contract claim to me. Well, I think that's very much a contract claim. It's a claim of whether the modification was permissible. Whether you can check. We have two versions. There has to be some external basis for thinking that something that the parties did was improper. Well, we have two versions of the contract. The original version and the later version. The later version, we believe, lacked consideration for these amendments. They say that that provision you're talking about was never in the contract. They do say that. And that goes back to the contract interpretation question under the original version of the contract, which did incorporate the general terms, and I think their position is, well, it incorporated it, but then it later took it back, and we say, no, it didn't take it back because the contract says it doesn't intend to replace the general terms and conditions. Again, there's a lot to be litigated here under the contract, and we're not trying to avoid that. We're just trying to say it has to happen in a particular place, and if plaintiffs are right, they're entitled to a specific remedy, which is not a remedy that the district... These general terms are not a term of this contract. They are. They made a term, but they are general terms in a regulation. They're general terms, separate from the regulation, actually. They're general terms and conditions that EPA has that were incorporated by this agreement. The last thing I wanted to say was I didn't hear... Your argument, though, is... I mean, the way you've characterized the reason for termination here on rebuttal sounds more like a general claim, that they're concerned... They're programmatic concerns. They're not about these specific grantees. Then that starts to look a lot more like what Mr. Unikowski said the government is arguing, which is some kind of general authority to restructure the program. I'm not sure how that is... That starts to look a lot less like a contract claim than some of the earlier representations. No, Your Honor. I think that the concerns are with the way these agreements were structured. That's not a problem. The point I was trying to make was that's not an objection to the statute. The statute doesn't say anything about anything. The statute just says make grants. No, but the sort of authority to restructure a program that the government thinks doesn't have sufficient oversight or whatever, that is not a claim that comes from the contract. That's the claim that comes from the executive's duty to take care that the laws be faithfully executed. Except, Your Honor, that the contract allows for term... In our view, properly read, the contract allows for termination when the award doesn't further, no longer furthers agency policies and priorities. That, of course, takes into account agency policy views. What's important is that the policy is about these contracts, not about the statute required. Do you agree that your contract defense has to be at least tolerable in sort of a Bell versus Hood kind of sense? Probably. I mean, if it was totally absurd, I don't... I think... Just give me the effect you're putting... You're not putting a lot of weight on this, the possibility that the no longer effectuates agency priorities clause or element is a valid ground for breach. Maybe I missed it, but it's not actually in the grant agreement. Walk me through why it might be valid. If you go to JA 551, EPA agrees to make the following clarifications to EPA to the EPA general terms and conditions. Give me a second. Sorry. My working stack did not have JA. Sorry, JA 551. Again, there's multiple versions of this. This is T. EPA agrees to make the following clarifications to the EPA general terms and conditions. These clarifications expand on, rather than replace or modify, the EPA general terms and conditions. One of these modifications... You're saying that incorporates general terms and conditions. Right, and at the time this was entered... This was before they amended? This was before the term... EPA incorporated the amended OMB, right? Into the term and conditions, yes, that's right. There's also the regulations, which are different, although they overlap. There's also, by the way, a JA 518, which is the original incorporation of the general terms and conditions. The recipient agrees to comply with the current EPA general terms and conditions available at and the website, which is the October 1st, 2023 version. Just in a nutshell, here it is, and then the later modification is not supported. That's in a nutshell, correct. And that's tolerable enough to get you in. I certainly think it is. Thank you, Your Honor. Thank you all very much. The case is submitted.
judges: Pillard; Katsas; Rao